UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              Case No.: 8:20-cr-83-T-36JSS

JOSE MANUEL VILLA PEREZ
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant's Motion to Dismiss (Dkt. 42), Supplemental Motion to Dismiss (Dkt. 44), and Motion to Suppress (Dkt. 45), the Government's responses in opposition (Dkts. 57, 58), and Defendant's reply (Dkt. 66). On September 9, 2020, the undersigned conducted an evidentiary hearing on the motions. For the reasons that follow, the undersigned recommends that Defendant's motions be denied.

## BACKGROUND

A February 19, 2020 indictment alleges that Jose Villa Perez ("Defendant") and two codefendants, "while upon the high seas and onboard a vessel subject to the jurisdiction of the United States," conspired to (Count I) and did knowingly and intentionally (Count II) "possess with intent to distribute five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine," in violation of 46 U.S.C. § 70503(a). (Dkt. 17.)

On May 11, 2020, Defendant filed his Motion to Dismiss, arguing that the vessel was not subject to the jurisdiction of the United States. (Dkt. 42.) On that same

day, Defendant filed his Supplemental Motion to Dismiss, raising two additional reasons to dismiss the indictment. (Dkt. 44.) Also on May 11, 2020, Defendant filed his Motion to Suppress, arguing that the contraband and his statements should be suppressed based on the absence of reasonable suspicion to board the vessel and because of the Government's delay in presenting him to a federal magistrate judge for an initial appearance. (Dkt. 45.) The motions are pending before the undersigned on referral from the presiding District Court Judge. (Dkt. 43, 46.)

On May 27, 2020, the Court noticed an evidentiary hearing on the pending motions. (Dkt. 56.) Upon agreed motions filed by the parties, the Court continued the hearing several times due to issues associated with the coronavirus pandemic, a quarantine at the jail where Defendant is being held, the deployment of a witness to Guam, and the parties' preference for an in-person evidentiary hearing. (Dkts. 62, 63, 64, 67, 82, 83, 84, 87, 88, 95, 97.) On September 9, 2020, the Court conducted an in-person evidentiary hearing on the motions. (Dkt. 106.) With the agreement of both parties, one witness for the Government, Lieutenant Denis Daly of the United States Coast Guard, appeared via videoconference from Guam, while the remaining witnesses appeared live in court.

## FACTUAL FINDINGS

At the evidentiary hearing on September 9, 2020, the Court heard the testimony of United States Coast Guard Lieutenant Denis Daly, United States Coast Guard Lieutenant Samantha Penate, Special Agent Gregory Gruel of the Federal Bureau of Investigation ("FBI"), and Investigator Luis Aquino of the Department of Homeland

2

Security. Additionally, the Court received into evidence without objection the Government's exhibits, which included photographs and diagrams of the vessel (Gov't Ex. 2-5), a map showing the location of the vessel's interdiction (Gov't Ex. 1), and photographs of the narcotics the Coast Guard seized (Gov't Ex. 6A-6D). The Court also received into evidence without objection Defendant's exhibits, which included a statement of stipulated of facts (Def. Ex. 1), Defendant's booking sheet from Pinellas County Jail (Def. Ex. 2), a written statement by Officer Penate (Def. Ex. 4), and an e-mail exchange between defense counsel and Officer Penate (Def. Ex. 5). Based on the testimony and the exhibits entered into evidence,[1] the undersigned recommends the following findings of fact.

On February 9, 2020, a maritime patrol aircraft observed a blue "panga-style"[2] vessel in international waters approximately 165 nautical miles south of the Dominican Republic. The vessel had a blue tarp on board and was equipped with one outboard engine. There were suspicious bales or packages visible on the boat as well as large fuel containers on the deck. The patrol aircraft conveyed this information to the U.S. Coast Guard cutter *Confidence*, which was on a patrol in the area. At approximately 12:30 p.m., Coast Guard officers aboard the *Confidence* were briefed regarding the suspicious vessel. At approximately 12:45 p.m., the Coast Guard

---

[1] The Government has also filed a certification from the Secretary of State (Dkt. 74-1), which in some cases represents proof of jurisdiction under the Maritime Drug Law Enforcement Act ("MDLEA"). *See* 46 U.S.C. § 70502(c)(2)(B); *see also United States v. Ruiz-Murillo*, 736 F. App'x 812, 816 (11th Cir. 2018).

[2] A "panga" or "panga-style" vessel is a modest-sized, open fishing boat, typically 19 to 28 feet in length.

deployed a five-person team aboard one of the *Confidence*'s small boats to conduct right of approach questioning under international law.[3]

At approximately 1:45 p.m. on February 9, 2020, the Coast Guard team arrived in the vicinity of the suspicious vessel.  The seas at that time were at about eight feet, raising safety concerns for the Coast Guard team.  When the Coast Guard team arrived, the vessel was not making any forward progress, and Officer Daly observed a jacket over the engine.  Officer Daly, who was the boarding officer on the Coast Guard's small boat, confirmed that the vessel was a 28-foot panga-style vessel with a crew of three.  A blue tarp was visible, covering a portion of the boat's cargo.   Officer Daly observed that the vessel had no name, no flag, and no other indicia of nationality. Officer Daly noticed that the vessel appeared to have been recently painted blue, about the same color as the ocean, which he testified is often an indicator of illegal activity. Officer Daly also observed large barrels of fuel in the aft portion of the boat, which he opined is also commonly an indicator of illegal activity for a boat of that size.

Officer Daly maneuvered the Coast Guard's small boat alongside the panga boat.  Officer Daly initiated the standard right of approach questioning.  To do this, he conveyed his questions to Officer Penate, who was a translator and a boarding team member.   Officer Daly and Officer Penate offered consistent, credible testimony

---

[3] "The 'right of approach' is a doctrine of international maritime common law that bestows a nation's warship with the authority to hail and board an unidentified vessel to ascertain its nationality." *United States v. Romero-Galue*, 757 F.2d 1147, 1149 n.3 (11th Cir. 1985).  "The 'right of approach' is codified by article 22 of the Convention on the High Seas." *Id.* (citing Convention on the High Seas art. 22, *opened for signature* Apr. 19, 1958, 13 U.S.T. 2312).

regarding their administration of right of approach questioning to each crew member on board the vessel. Officer Penate translated Officer Daly's right of approach questioning to each member of the panga vessel's crew. Officer Daly first confirmed through questioning that no weapons were on board the panga boat. Next, Officer Daly asked the crew members who the master of the vessel was. Each crew member identified himself as the master. When asked about the nature of their voyage, the crew members responded that they were "transiting." Officer Daly asked the men their nationality, and they responded that they were Dominican. Next, Officer Daly asked what the nationality of the vessel was, but the men did not respond and instead only shrugged. Officer Daly testified that he was trained to ask these questions in a specific way, and the questions were printed on a laminated sheet utilized by the boarding team.

At this point, based on safety concerns, the Coast Guard officers provided the three crew members with lifejackets, disembarked them from the panga vessel, and then brought them on board the *Confidence*. The boarding team then returned to the panga boat and, at approximately 3:00 p.m., received permission from the Coast Guard to treat the vessel as without nationality and conduct a law enforcement boarding. Officer Daly and one other officer boarded the vessel. Officer Daly began a safety sweep to ensure the vessel was not taking on water. As part of this safety sweep, Officer Daly checked under the blue tarp and found that it was concealing large burlap sacks of what was suspected to be narcotics. Officer Daly did not find any fishing equipment or identification documents inside the vessel. Due to safety

concerns, the boarding team removed the packages containing suspected narcotics and returned them to the deck of the *Confidence*.  This process took approximately two trips.  In all, the Coast Guard officers recovered fifteen packages weighing 75 to 100 pounds each.  Once back on the deck of the *Confidence*, Officer Daly performed field tests on the suspected narcotics.  After the second and third field tests were presumptively positive for cocaine, the boarding team received permission from the Coast Guard to treat the crew of the panga vessel as detainees.

In accordance with the Coast Guard's standard procedures, the three crew members of the panga vessel, including Defendant, were shackled to the deck of the *Confidence* and watched by two Coast Guard members, who maintained a log of their activity.  Defendant and the other crew members had a toilet to use, were given the same meals as the crew of the *Confidence*, and were seen by a doctor twice a day.  They had no ability to contact family members, speak with an attorney, or appear before a judge.  They were neither given *Miranda* warnings nor interrogated.

After approximately two days on board the *Confidence*, the crew members of the panga boat were transferred to Coast Guard cutter *Bear*, which was returning to port earlier than the *Confidence*.  The crew of the panga boat remained on board the *Bear* for about five days.  During this time, a criminal complaint was filed against Defendant and his co-defendants in the Middle District of Florida, and warrants were issued for their arrest in this case.  (Dkts. 1-4.)   After the *Bear* returned to port on February 17, 2020, the defendants were brought into the country through United States Customs and Border Protection ("CBP") in Miami, Florida.  That same day, which was

Washington's Birthday, the defendants were flown to the Tampa Bay area and were taken to a U.S. Coast Guard Investigative Service ("USCGIS") facility in Clearwater, Florida.

At approximately 2:00 p.m. on February 17, 2020, Special Agent Luis Aquino conducted an interrogation of Defendant. Defendant waived his *Miranda* rights and declined to have the interrogation recorded. During the interview, Defendant said he had received a call from an individual at a blocked number who said he needed an assistant for a trip. Defendant accepted the offer, understanding that the request was for drug smuggling. A few days later, Defendant received instructions to go to a beach area in the southern Dominican Republic. Once there, Defendant met two other men who had been recruited for the trip, and the three men used coordinates pre-programmed into a GPS device to travel in the panga boat to a location in Venezuela. After arriving in Venezuela, the crew was met by several Venezuelan nationals, who took the crew to a house to await further instruction. The crew stayed in Venezuela for four or five days before they were taken back to the panga boat, which was now painted blue and loaded with 15 bales of what Defendant believed to be cocaine. The crew departed for the Dominican Republic, again using coordinates programmed into a GPS device. The crew had been at sea for approximately a day and a half when they spotted an aircraft overhead, and the panga boat and crew were interdicted by the Coast Guard later that same day, February 9, 2020.

At approximately the same time that Defendant was interrogated, Special Agent Karen McAllister performed a post-*Miranda* interrogation of co-defendant Julio

Cesar Santana Beltre.  Beltre provided an account of the crew's voyage that was consistent with Defendant's account.  The third co-defendant, Fidel Cueva Gueverra, declined to provide a statement to law enforcement.

On February 18, 2020, nine days after their interdiction by Coast Guard cutter *Confidence* and one day after they entered the United States, the Defendants were brought before a magistrate judge for their initial appearance and detention hearing on the criminal Complaint.  (Dkt. 15.)  The following day, the Government indicted Defendant and his two co-defendants with conspiracy to possess with intent to distribute, and possession with intent to distribute, over five kilograms of cocaine while on board a vessel subject to the jurisdiction of the United States.  (Dkt. 17.)

## ANALYSIS

### A.    Motion to Dismiss

In his Motion to Dismiss, Defendant argues that the indictment should be dismissed for lack of jurisdiction under the Maritime Drug Law Enforcement Act ("MDLEA").  *See* 46 U.S.C. §§ 70501–70508.  In response, the Government argues that the vessel was subject to the jurisdiction of the United States because it was a vessel without nationality based on 1) the failure of the vessel's master or masters to make a claim of nationality and, alternatively, 2) State Department certification showing that both Venezuela and the Dominican Republic could neither confirm nor deny registration of the vessel.  (Dkt. 58 at 5-11.)

As a threshold matter, the Court notes that the parties dispute the Government's burden of proof regarding jurisdiction under the MDLEA.  Jurisdictional questions

under the MDLEA "are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a). The Eleventh Circuit has repeatedly recognized that "the MDLEA jurisdictional requirement is not an essential element" that must be submitted to a *jury* for proof beyond reasonable doubt. *United States v. Francisco*, No. 19-13861, 2020 WL 4743480, at *2 (11th Cir. Aug. 17, 2020) (emphasis added); *see also United States v. Tinoco*, 304 F.3d 1088, 1109–10 (11th Cir. 2002) ("[T]he . . . jurisdictional requirement is not an essential ingredient or an essential element of the MDLEA substantive offense, and, as a result, it does not have to be submitted to the jury for proof beyond a reasonable doubt."). In doing so, however, the Eleventh Circuit has expressly left open the question of whether "the government must establish the jurisdictional requirement beyond a reasonable doubt or by a preponderance of the evidence." *Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2002). It is recommended that the Government has met both standards of proof in this case. *See Griffin v. United States*, 588 F.2d 521, 530 n. 19 (5th Cir. 1979)[4] (choosing not to resolve issue concerning the burden of proof that should apply when the party carrying the burden had "met both burdens of proof").

### 1. Claim of Nationality

The Constitution grants Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S.

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

Const. art. I, § 8, cl. 10.  In furtherance of this power, Congress passed the Maritime Drug Law Enforcement Act ("MDLEA"), which makes it a crime to knowingly or intentionally "manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance," while "on board a covered vessel."  46 U.S.C. § 70503(a)(1).  A "covered vessel" is defined to include a vessel subject to the jurisdiction of the United States.  46 U.S.C. § 70503(e)(1).

The MDLEA recognizes six broad categories of vessels subject to the jurisdiction of the United States for purposes of criminal prosecution.  46 U.S.C. § 70502(c)(1).  One of the six categories is at issue here: stateless vessels, also known as vessels without nationality. *Id.* § 70502(c)(1)(A); *see also United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016).  The MDLEA defines a vessel without nationality to include any of the following: (1) "a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed"; (2) "a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel"; and (3) "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality."  46 U.S.C. § 70502(d)(1)(A)-(C); *see also United States v. Guerro*, 789 F. App'x 742, 746–47 (11th Cir. 2019) ("[A]n officer of the United States must request a claim of registry and the master or individual in charge

10

must fail to answer that request before a vessel can be deemed stateless under § 70502(d)(1)(B).").

Here, the evidence presented establishes that Officer Daly of the United States Coast Guard affirmatively asked the crew members of the panga boat who the master of the vessel was, and each crewmember identified himself as the master.  Upon further questioning, the crew members identified themselves as Dominican, but when Officer Daly inquired about the nationality of the vessel, the crew members did not respond and instead only shrugged.  Officer Daly accomplished this questioning through a translator, Officer Penate.  The Court observed the demeanor of Officer Daly and Officer Penate on the witness stand and has considered their interests in testifying. Both Officer Daly and Officer Penate were credible and appeared forthright in their testimony during the evidentiary hearing.

Given the officers' testimony and evidence, the Court finds that the crew members, who claimed to be the master, were given an opportunity to make a claim of nationality for the vessel but failed to do so.  *See, e.g.*, *United States v. Medina*, 793 F. App'x 850, 852 (11th Cir. 2019) (holding MDLEA jurisdiction was established under § 70502(d)(1)(B) where "any individual who possessed the authority to make a claim of registry or nationality for the vessel was given the opportunity to do so at the request of a duly authorized officer" but failed to do so); *see United States v. Prado*, 933 F.3d 121, 130 (2d Cir. 2019) ("It is only if 'on request' of a duly authorized officer, the master 'fails to make a claim of nationality or registry,' that statelessness is established." (alteration adopted) (citing § 70502(d)(1)(B))).  Consequently, MDLEA

11

jurisdiction was established in this case both beyond reasonable doubt and by a preponderance of the evidence. *See, e.g.*, *United States v. De La Cruz*, 443 F.3d 830, 832 (11th Cir. 2006) (per curiam).

In challenging MDLEA jurisdiction under § 70502(d)(1)(B), Defendant argues that the evidence is insufficient to satisfy the Government's burden because Officer Penate's testimony was inconsistent. Specifically, Defendant points out that Officer Penate failed to state in her written report whether she inquired about the nationality of the vessel.

As previously noted, Officer Penate testified consistent with Officer Daly regarding the administration of right of boarding questions to each crew member on board the vessel. Officer Penate, along with Officer Daly, responded directly and without evasiveness to all questions posed on direct and cross-examination. Although Officer Penate did not expressly state in her one-page written report that she asked about the vessel's nationality (Dkt. 109-3), she testified in-court that she did ask this question. Officer Penate's testimony on this issue is consistent with Officer Daly's testimony. In addition, in his lengthier written report prepared as the boarding officer, Officer Daly specifically recounted that he asked who the master was and inquired about the nationality of the vessel: "I asked what the nationality of the vessel was, but none of the crewmembers gave a response, they just shrugged at me." (Dkt. 45-1.) Officer Penate's written report, at one page, was shorter than Officer Daly's, and she acknowledged in her testimony that she inadvertently omitted whether she inquired about the vessel's nationality.

Having observed Officer Penate's and Officer Daly's in-court testimony, considered their interests in testifying as well as the consistencies and inconsistences in their testimony, and considered the reports prepared by both Officer Penate and Officer Daly, the Court finds the testimony of Officer Daly and Officer Penate to be credible. *See generally United States v. Ramirez-Chilel*, 289 F.3d 744, 750 (11th Cir. 2002) (deferring to magistrate judge's credibility determination where magistrate judge took into account "the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand").

Defendant further argues that Officer Penate was not a credible witness because she initially agreed to speak with defense counsel but later cancelled her telephone interview. In response, the Government argued that it is common procedure in the Middle District of Florida to coordinate witness interviews through the assigned AUSA. The Court acknowledges that it is generally permissible for a defense lawyer to investigate a case by attempting to contact government witnesses, including without the consent of opposing counsel. *See, e.g.*, *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 6 (D.D.C. 2004) ("[G]enerally speaking, no one owns a witness and each party to a lawsuit has an equal right to interview the witnesses who are not parties."); *Gregory v. United States*, 369 F.2d 185, 187–188 (D.C. Cir. 1966) ("But we know of nothing in the law which gives the prosecutor the right to interfere with the preparation of the defense by effectively denying defense counsel access to the witnesses except in his presence."). However, a witness is also free to decline to speak with opposing counsel. *See United States v. Miller*, 381 F.2d 529, 538 n. 7 (2d Cir. 1967) ("While the

13

Government is doubtless bound not to obstruct a defendant's access to a prospective witness, we know of no rule requiring the witness to submit to an interview."). Here, it was reasonable that Officer Panate declined to speak with defense counsel after initially agreeing to do so. The argument and testimony presented to the Court indicate that Officer Panate was not certain of the protocol for speaking with defense counsel and was instructed to contact her chain of command. The Court observed Officer Panate's testimony and demeanor on the witness stand and finds her explanation regarding this issue credible. Thus, the Court concludes that Officer Panate's credibility was not undermined where she initially agreed to a phone interview with defense counsel and then cancelled the interview days later.

In sum, the evidence presented demonstrates that the Coast Guard affirmatively asked who the master of the vessel was and separately asked the crew members to provide the vessel's nationality. Upon inquiry by the Coast Guard, the crew members, while claiming to be the masters of the vessel, failed to make any claim of nationality or registry for the vessel. This evidence establishes that the vessel was "without nationality," as defined under § 70502(d)(1)(B), and that the vessel was therefore subject to the jurisdiction of the United States under § 70502(c)(1)(A).

### 2.     *State Department Certification*

As an alternative basis for jurisdiction, the Government has filed a certification from the Secretary of State, which the Government argues is conclusive of MDLEA jurisdiction over the vessel. (Dkt. 74-1; Dkt. 59 at 11.) In response, Defendant argues

that State Department certification is not conclusive of jurisdiction in this case.  (Dkt. 66 at 2.)

The MDLEA defines "vessel subject to the jurisdiction of the United States" to include, in pertinent part, "a vessel without nationality" and "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States."  46 U.S.C. § 70502(c)(1)(A) & (C).  Section 70502(d)(2) addresses the impact of a foreign nation's response to a claim of registry on vessels without nationality:

> The response of a foreign nation to *a claim of registry under paragraph (1)(A) or (C)* may be made by radio, telephone, or similar oral or electronic means, and is proved conclusively by certification of the Secretary of State or the Secretary's designee.

46 U.S.C. § 70502(d)(2) (emphasis added).  As previously noted, § 70502(d)(1)(A) defines vessel without nationality to include "a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed," while § 70502(d)(1)(C) defines vessel without nationality to include "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality."  Thus, regarding vessels without nationality, State Department certification is relevant to jurisdiction under the MDLEA where the master has made a claim of registry.

Separately, State Department certification is relevant where a vessel is in fact registered in a foreign nation or is in the territorial waters of a foreign nation. Regarding these circumstances, the MDLEA provides as follows:

> (2) Consent or waiver of objection.—Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under paragraph (1)(C) or (E)—
>
> . . . .
>
> (B) is proved conclusively by certification of the Secretary of State or the Secretary's designee.

46 U.S.C. § 70502(c).  Section 70502(c)(1)(C) addresses vessels registered in a foreign nation, while § 70502(c)(1)(E) addresses vessels in the territorial waters of a foreign nation.

Applying these provisions of the MDLEA, courts in the Eleventh Circuit have found State Department certification conclusive of jurisdiction where the vessel was *registered* to a foreign nation that, regarding the vessel at issue, either consents to or waives objection to the enforcement of United States law.  *See, e.g.*, *United States v. Antonio Munoz Brant-Epigmelio*, No. 8:09-CR-404-T-23TGW, 2010 WL 557283, at *3 (M.D. Fla. Feb. 11, 2010) (addressing conclusive effect of State Department certification regarding Venezuela's waiver as to vessel registered in Venezuela), *aff'd sub nom. United States v. Brant-Epigmelio*, 429 F. App'x 860 (11th Cir. 2011).   In addition, courts in the Eleventh Circuit have recognized that State Department certification can establish a vessel's statelessness, and thus jurisdiction over the vessel, where the master of the vessel makes a *claim of registry* but the claimed nation of registry

16

can neither confirm nor deny the vessel's registry. *See United States v. Campbell*, 743 F.3d 802, 804 (11th Cir. 2014) (holding statelessness properly established where individual identified himself as the master of the vessel and claimed the vessel was registered in Haiti, but Haiti could neither confirm nor deny the vessel's Haitian registry).

However, courts in the Eleventh Circuit have not found State Department certification conclusive of jurisdiction in the circumstance presented here, where there was no evidence of registry in any foreign nation nor any claim that the vessel was registered in a foreign nation. In addressing this issue, the Government argues that "*if* the vessel was registered, it very likely would have been registered in either the Dominican Republic, or Venezuela." (Dkt. 58) (emphasis added). However, under § 70502(d)(2), consent or waiver of a foreign nation is proven conclusively by State Department certification where the United States is proceeding under § 70502(d)(1)(A) or (C) (involving verbal claims of registry), which is not the case here. Separately, § 70502(C)(2)(B) does not apply here because the vessel was neither registered in a foreign nation nor located in the territorial waters of a foreign nation.

In this case, there is no evidence that the vessel was registered in a foreign nation nor any evidence that a claim of registry was made. *See* § 70502(e) (defining claim of nationality or registry under the MDLEA to include only a verbal claim, possession of documents evidencing registry, or flying a nation's ensign or flag). Thus, under the facts presented here, the State Department certification itself does not establish any basis for jurisdiction over the vessel under the MDLEA. Instead, the State Department

certification proves only what it says: that the Dominican Republic and Venezuela could neither confirm nor deny the vessel's registry.  (Dkt. 74-1.)  However, as previously explained, the Government has established beyond reasonable doubt, and by a preponderance of the evidence, that the vessel was a vessel without nationality because, on request, the masters of the vessel failed to make any claim of registry or nationality for the vessel.  *See* 46 U.S.C. § 70502(d)(1)(B).

### B.    Supplemental Motion to Dismiss

In his Supplemental Motion to Dismiss, Defendant argues that the MDLEA exceeds Congress's powers under the Piracies and Felonies Clause of Article I because it lacks a nexus requirement.  (Dkt. 44 at 2-3.)  Defendant further argues that the MDLEA's lack of a nexus requirement violates the Due Process Clause of the Fifth Amendment.  (Dkt. 44 at 4-5.)

Defendant acknowledges, and the Court agrees, that these arguments are each foreclosed by binding Eleventh Circuit precedent.  The Piracies and Felonies Clause empowers Congress "[t]o define and punish Piracies and Felonies on the high Seas, and Offences against the Law of Nations."  U.S. Const., art. I, § 8, cl. 10.  In *United States v. Estupinan*, the Eleventh Circuit rejected the argument "that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the [Maritime Drug Law Enforcement Act]."  453 F.3d 1336, 1338 (11th Cir. 2006).  In addition, the Eleventh Circuit has recognized that "the conduct proscribed by the [MDLEA] need not have a nexus to the United States because universal and protective principles support its extraterritorial reach."  *United States v. Campbell*, 743 F.3d 802, 810 (11th

18

Cir. 2014); *see also Estupinan*, 453 F.3d at 1338 ("[T]his circuit and other circuits have not embellished the [Act] with the requirement of a nexus between a defendant's criminal conduct and the United States." (internal quotation marks and alterations omitted) (quoting *United States v. Rendon*, 354 F.3d 1320, 1325 (11th Cir. 2003)).

Thus, as Defendant acknowledges, binding Eleventh Circuit precedent forecloses any argument that the MDLEA either exceeds Congress's power under Article I or violates the Due Process Clause in the absence of a nexus requirement. *See, e.g.*, *United States v. Cruickshank*, 837 F.3d 1182, 1188 (11th Cir. 2016) (concluding that "all of Cruickshank's arguments concerning the MDLEA are foreclosed by our prior precedent"). It is therefore recommended that Defendant's Supplemental Motion to Dismiss be denied.

### C. Motion to Suppress

In his Motion to Suppress, Defendant first argues that the Court should suppress the cocaine seized from the panga boat, along with Defendant's statement, because Coast Guard lacked reasonable suspicion to board the vessel. (Dkt. 45 at 5-10.) Defendant further argues that the Court should suppress his statements because the Government's delay in bringing him before a federal magistrate judge violated Rule 5 of the Federal Rules of Criminal Procedure.

### 1. Reasonable Suspicion

The Motion to Suppress is due to be denied because the Fourth Amendment does not apply under the circumstances. In a recent decision, the Eleventh Circuit unequivocally held that "the Fourth Amendment does not apply to searches and

seizures (arrests) by the United States of a non-citizen/non-resident alien *arrested in international waters or a foreign country*." *United States v. Cabezas-Montano*, 949 F.3d 567, 593 (11th Cir. 2020) (emphasis in original) (citing *Verdugo-Urquidez*, 494 U.S. at 274–75), *cert. denied sub nom. Palacios-Solis v. United States*, No. 19-1195, 2020 WL 3492674 (U.S. June 29, 2020). It is undisputed in this case that Defendant is a non-citizen, with no identifiable ties to the United States, who was arrested in international waters. Accordingly, under binding Eleventh Circuit precedent, the Fourth Amendment does not apply.

In reaching this conclusion, the Court rejects Defendant's argument that *United States v. Tinoco*, 304 F.3d 1088, 1116 (11th Cir. 2002), applies as binding precedent on the question of whether the Fourth Amendment applies to searches and seizures by the United States of a non-citizen/non-resident alien arrested in international waters. The Eleventh Circuit in *Tinoco* did not expressly decide the question of whether the Fourth Amendment applied to a search of a vessel crewed by foreign citizens in international waters. As the Eleventh Circuit has since recognized, "no argument was made [in *Tinoco*] that the Fourth Amendment did not apply. *United States v. Aguilar*, 286 Fed. App'x. 716, 722 n. 6 (11th Cir. 2008). Moreover, in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court expressly concluded the Fourth Amendment did not apply to the search of a Mexican citizen's residence in Mexico by United States agents. In its recent published decision in *Cabezas-Montano*, the Eleventh Circuit applied *Verdugo-Urquidez*, and not *Tinoco*, on the question of whether the

Fourth Amendment applies to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country. 949 F.3d at 593.  Thus, this Court adheres to the Eleventh Circuit's decision in *Cabezas-Montano* and the Supreme Court's decision in *Verdugo-Urquidez* in concluding that Defendant, a non-U.S. citizen aboard a vessel in international waters, cannot raise a Fourth Amendment claim in the MDLEA context.  *See also United States v. Bautista Ortiz*, 808 F. App'x 984, 988 (11th Cir. 2020) ("[W]e've held that the Fourth Amendment does not apply to non-U.S. citizens and non-U.S. residents subject to the MDLEA.").

Furthermore, as the Government argues, the Fourth Amendment is inapplicable for a second reason.  To demonstrate standing to raise a Fourth Amendment claim, a defendant must show an actual or subjective expectation of privacy in the area searched and the expectation must be one that "society is prepared to recognize as 'reasonable.'"  *Hudson v. Palmer*, 468 U.S. 517, 525 (1984) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).  Regarding vessels, courts have held that "neither captain nor crew has a legitimate expectation of privacy . . . in an area which is subject to the common access of those legitimately aboard the vessel."  *United States v. Freeman*, 660 F.2d 1030, 1034 (5th Cir. Unit B 1981).  Such common areas have been held to include cargo holds, *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980); ice holds, *United States v. DeWeese*, 632 F.2d

1267 (5th Cir. 1980); and engine rooms, *United States v. Stuart-Caballero*, 686 F.2d 890 (11th Cir.1982), *cert. denied*, 459 U.S. 1209 (1983).

Here, the Coast Guard seized 15 bales of cocaine from a panga-style fishing vessel. Photographs submitted into evidence confirm that the boat was an open vessel. (Gov't Ex. 2-5.) Defendant is unable to establish that he possessed a subjective expectation of privacy that society would recognize as objectively reasonable. In particular, presuming, for the sake of argument, that the wrapping and covering of the bales of cocaine established some subjective expectation of privacy, this is not an expectation that society would recognize as reasonable. *See United States v. Lopez*, 761 F.2d 632, 636 (11th Cir. 1985) ("We cannot imagine that society would recognize a reasonable expectation of privacy in the use of 'dead space' in the hull of a ship, sealed with permanent fiberglass and painted to match the surrounding surfaces, for the legitimate storage of personal items[.]"); *see also United States v. Wilson*, 528 F. Supp. 1129, 1131 (S.D. Fla. 1982) (finding no legitimate expectation of privacy regarding burlap-wrapped bales of marijuana that were "not located in any area of the vessel which could be considered private as to any individual near the vessel, but rather, were stacked out in the open"). Thus, Defendant's Fourth Amendment argument is due to be denied for this alternative reason, because Defendant cannot establish standing to raise a Fourth Amendment claim.

Lastly, assuming the Fourth Amendment applied and Defendant possessed standing to challenge the constitutionality of the search, the Coast Guard possessed reasonable suspicion to board the vessel. "To determine whether reasonable suspicion

exists, the court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (internal quotation marks omitted). Here, Officer Daly offered credible testimony, consistent with other record evidence, that the vessel was unmarked, flagless, and bore no identifying marks. The vessel was painted blue in an apparent effort to avoid aerial detection. The vessel's design fit the profile of a smuggling vessel. According to Officer Daly, although the vessel was open to the elements and equipped with only a 70-horsepower motor, it was far out at sea in an area commonly known for drug trafficking. The vessel did not have any fishing equipment on board. The crew of the vessel utilized blue tarps to partially conceal the vessel's cargo and possibly to protect the cargo from water damage. Large fuel drums were visible on the vessel, which was unusual for a boat of that size. The vessel was riding low in the water and was not making way when the Coast Guard officers arrived. The diagrams and photographs accepted into evidence were consistent with and supported Officer Daly's description of the suspicious vessel.

Considered together, these circumstances provided reasonable suspicion for the Coast Guard to board the vessel. *See, e.g.*, *Tinoco*, 304 F.3d at 1116 (holding Coast Guard possessed reasonable suspicion to believe vessel was involved in drug smuggling where vessel was unmarked, flagless, bore no identifying marks, fit the profile of a smuggling vessel, and crew failed to respond to Coast Guard, attempted to flee from Coast Guard cutter, and jettisoned cargo from the vessel); *United States v.*

*Padilla-Martinez*, 762 F.2d 942, 950 (11th Cir. 1985) (holding reasonable suspicion existed where vessel was riding low in the water, flying no flag, carrying no cargo, and captain reportedly left the vessel several nights before to get engine parts); *United States v. Pearson*, 791 F.2d 867, 870 (11th Cir. 1986) (reasonable suspicion existed based on intelligence that smuggler was in area, vessel was dead in the water, rendezvous with smaller fishing vessel outside of fishing waters, neither vessel had running lights on).

### 2.    *Suppression of Defendant's Statements*

Defendant further argues that his statements should be suppressed because they 1) resulted from the unlawful seizure addressed above and 2) the Government's delay in presenting him to a magistrate judge violated Rule 5.  (Dkt. 45 at 10-25.)  In response, the Government argues that the Fourth Amendment is inapplicable and that the delay in presenting Defendant to a magistrate judge for an initial appearance did not violate Rule 5.  (Dkt. 57 at 19-30.)

The Court first finds that, as addressed above, the Fourth Amendment did not apply to the Coast Guard's seizure of the vessel, and, if it did, reasonable suspicion existed to support boarding the vessel.  *See Cabezas-Montano*, 949 F.3d at 593 ("[T]he Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country.").    Thus, Defendant's post-arrest, post-*Miranda* statements to law enforcement are not the fruit of the poisonous tree and suppression is not warranted on this basis.  *See, e.g.*, *Colorado v. Spring*, 479 U.S. 564, 571 (1987) (recognizing that if there is no poisonous tree, there can be no fruit to suppress); *see also United States v.*

*Carlton*, 682 F. App'x 242, 244 (4th Cir. 2017) ("Absent a Fourth Amendment violation, any statements attributable to Carlton were not 'fruit of the poisonous tree.'"); *United States v. Joyner*, No. 2:15-CR-29-FTM-29MRM, 2015 WL 7752874, at *7 (M.D. Fla. Dec. 2, 2015) ("Since the Court has found no Fourth Amendment violation, there is no 'poisonous tree' which would require suppression of derivative evidence.").

In addition, Defendant has not established that the Government's delay in bringing him before a magistrate judge for an initial appearance violated Rule 5. "A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(B). Courts determine whether a delay is unnecessary or unreasonable based on all of the facts and circumstances of the case. *See* Notes of Advisory Committee on Rules to Rule 5. Thus, federal courts have found delays for purposes of transportation of the defendant, jurisdictional determinations, and availability of the magistrate judge to be legitimate and necessary (and therefore reasonable) and not in violation of the Rule 5 requirement of promptness. *See, e.g.*, *United States v. Wilson*, 838 F.2d 1081, 1085 (9th Cir. 1998) (addressing delay for purpose of transport); *United States v. Van Poyck*, 77 F.3d 285, 289 (9th Cir.) (addressing delay due to unavailability of magistrate judge), *cert. denied*, 519 U.S. 912 (1996).

In *United States v. Purvis*, the Eleventh Circuit expressly addressed "unnecessary delay" under Rule 5(a)(1)(B). 768 F.2d 1237, 1238-39 (11th Cir. 1985). The court considered four factors in determining whether a delay was unnecessary, including:

25

(1) the distance between the location of the defendant's arrest in international waters and the U.S. port he was brought to; (2) the time between the defendant's arrival at the U.S. port and his presentment to the magistrate judge; (3) any evidence of mistreatment or improper interrogation during the delay; and (4) any reason for the delay, like exigent circumstances or emergencies. *Id.*

In this case, Defendant was detained on February 9, 2020, brought into the United States on Washington's Birthday, February 17, 2020, and presented to a United States magistrate judge the following day, February 18, 2020. Thus, Defendant was detained for a total of nine days before he was brought before a magistrate judge. As to the first factor, Defendant was detained aboard the *Confidence* approximately 165 nautical miles south of the Dominican Republic and approximately 1,200 miles from Tampa, Florida. Officer Daly testified that after two days aboard the *Confidence*, Defendant was transferred to the *Bear*, which was returning to port sooner. There is no evidence before the Court that either Coast Guard vessel had the capability for remote hearings, and Officer Daily testified that even e-mail access was uncommon while at sea. Defendant was aboard the *Confidence* and the *Bear* for a total of seven days. As courts in the Eleventh Circuit have noted, "Coast Guard Cutters cannot be used as taxis to ferry detainees immediately to the nearest United States port. . . . The government is not required to take the fastest possible route to the courthouse, just a reasonable one." *United States v. Quijije-Franco*, No. 17-60246-CR, 2017 WL 11536137, at *4 (S.D. Fla. Dec. 27, 2017). Given the logistics of interdicting a vessel in the middle of the Caribbean Sea and then transferring Defendant and his co-defendants to a

separate Coast Guard cutter that was returning to port, the Court finds this factor neutral.

As to the second factor, Defendant was brought into the United States through an immigration facility in Miami on February 17, 2020, and then flown to a USCGIS facility in Clearwater, Florida, the same day.  Because February 17, 2020, was Washington's Birthday, the United States District Court for the Middle District of Florida was closed, and no United States magistrate judge was available within the meaning of Federal Rule of Criminal Procedure 5(a).  *See* Fed. R. Crim. P. 45(a)(6) (defining and listing "Legal Holiday[s]").  Defendant was brought before a magistrate judge the following day, February 18, 2020.  As federal courts have recognized, "[a] magistrate can be considered unavailable due to a host of reasons including: a busy docket; *a closed court*; or other factors, such as distance and weather, that make transportation impractical, futile, and/or dangerous."  *United States v. Boche-Perez*, 755 F.3d 327, 338 (5th Cir. 2014) (emphasis added).

While Defendant argues in part that the Government could have brought him before a magistrate judge in the Southern District of Florida, the United States District Court for the Southern District of Florida was also closed February 17, 2020, the day Defendant arrived in Miami.  *See* Court Hours/Holidays, United States District Court, Southern District of Florida, www.flsd.uscourts.gov/court-hours-holidays.  The Court further acknowledges Defendant's argument that both the Southern District of Florida and the Middle District of Florida generally have a magistrate judge "on call" or "on duty" at all times.  (Dkt. 45 at 22-23.)  However, the availability of a magistrate judge

27

for duty matters does not mean that a magistrate judge is available to conduct in-court proceedings at times when the Court is closed, particularly where in-court proceedings require court security, courtroom deputies, and translators.  *See, e.g.*, *United States v. Lizarraga-Caceres*, No. 8:07-CR-99-T-23TBM, 2007 WL 1796968, at *15 (M.D. Fla. June 21, 2007) ("[I]n this district, while at least one magistrate judge is on call at all times, as a practical matter one is not available to conduct an appropriate Rule 5(a) proceeding after the court has adjourned for the evening.").  The Court finds this factor is neutral.

As to the third factor, there is no evidence of any mistreatment or improper interrogation in the custody of the Coast Guard.  In fact, the evidence demonstrates that Defendant and his crewmates were treated well and not interrogated while in the custody of the Coast Guard.  Although Defendant was interrogated by federal law enforcement agents on February 17, 2020, after waiving his rights, federal court was closed on that day.  This factor weighs in favor of the Government.

As to the final factor, the evidence establishes that the reasons for the delay in this case consisted of 1) the Government's effort to transport Defendant via two Coast Guard cutters from international waters to Miami; 2) administrative processing through customs in Miami; and 3) the unavailability of a magistrate judge on February 17, 2020, a federal holiday.  Notably, the evidence does not demonstrate that the purpose of the delay was to interrogate Defendant.  The evidence shows that the Coast Guard transferred Defendant to a different Coast Guard cutter to transport him to the Port of Miami as quickly as possible.  This factor weighs in favor of the Government.

The movant bears the burden of establishing "unnecessary delay" under Rule 5(a), *Cabezas-Montano*, 949 F.3d at 592 n. 20.   Defendant has not met that burden. Rather, the evidence demonstrates that the delay in this case was entirely attributable to the transporting of Defendant from international waters, his immigration processing, and the unavailability of a magistrate judge due to a federal holiday.   The Court therefore finds that the nine-day delay before Defendant was brought before a magistrate judge was reasonable.   *See United States v. Castillo*, 899 F.3d 1208, 1217–18 (11th Cir. 2018) (Martin, J., concurring) (finding a 19-day delay to be reasonable where defendant was taken into custody approximately 1,000 miles from the port of Miami); *United States v. Savchenko*, 210 F.R.D. 503, 506 (S.D. Cal. 2001) ("Delay for purposes of transportation of the defendant, jurisdictional determinations, [or] availability of the magistrate judge . . . are all legitimate and necessary (hence reasonable) delays and are not in violation of the Rule 5 requirement of promptness."); *United States v. Angulo*, 2016 WL 4400476, at *6 (S.D. Fla. Jul. 28, 2016) (denying a motion to dismiss based on due process violations of unnecessary delay under Rule 5 where interdiction occurred 290 nautical miles south of Guatemala and defendants were transported to the Southern District of Florida).

Accordingly, it is **RECOMMENDED** that:

1. Jose Manuel Villa Perez's Motion to Dismiss (Dkt. 42) be **DENIED**;

2. Jose Manuel Villa Perez's Supplemental Motion to Dismiss (Dkt. 44) be **DENIED**; and

3.  Jose Manuel Villa Perez's Motion to Suppress (Dkt. 45) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, on November 3, 2020.

 

JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable Charlene Edwards Honeywell
Counsel of Record